**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MONTVILLE TOWNSHIP,

                      Plaintiff,

v.

WOODMONT BUILDERS, LLC, ET. AL.

                      Defendants.

Civ. No.  03-2680 (DRD)

**O P I N I O N**

*Appearances by:*

COFFEY & ASSOCIATES
by: Gregory J. Coffey, Esq. and Richard J. Dewland, Esq.
465 South Street
Morristown, NJ 07960

    *Attorneys for Plaintiff*

STERN, LAVINTHAL, FRANKENBERG & NORGAARD, LLC
by: Mark S. Winter, Esq.
293 Eisenhower Parkway, Suite 300
Livingston, NJ 07039

    *Attorneys for Defendants David and Nathan Mandelbaum*

**DEBEVOISE, Senior District Judge**

    This matter involves a dispute over a parcel of property ("the Property") purchased by

Plaintiff Montville Township ("the Township") from Defendants David and Nathan

Mandelbaum, ("the Mandelbaums"), along with various other individuals who are no longer

parties to this action.  After discovering that the Property, which had been used as a fruit orchard

before being owned by the Mandelbaums, was contaminated with various hazardous chemicals, the Township filed suit seeking to recover cleanup costs from the Mandelbaums and the developer who contracted to build residences on a portion of the Property, Woodmont Builders, LLC ("Woodmont").  In response, the Mandelbaums filed an Answer in which they asserted ten counterclaims against the Township.

In a ruling issued on September 10, 2004 the Court dismissed nine of the twelve claims asserted against the Mandelbaums.  See 2004 U.S. Dist. LEXIS 30606 (D.N.J. September 10, 2004).  Woodmont and the Mandelbaums then moved for summary judgment, which the Court granted on October 7, 2009.  See 2009 U.S. Dist. LEXIS 93629 (D.N.J. October 7, 2009). Accordingly, Woodmont is no longer a party to this action.  Moreover, counts two, three, and five of the Mandelbaum's counterclaims – which sought common law contribution, contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675, and declaratory judgment that the Mandelbaums were not liable – are moot in light of the Court's October 7, 2009 ruling that they are not responsible for remediating the environmental contamination on the Property.  Pursuant to that ruling, all of the Township's claims against the Mandelbaums have been dismissed.  Of the myriad claims, crossclaims, and counterclaims asserted by the parties against one another at the outset of the suit, only the Mandelbaums' seven remaining counterclaims against the Township have yet to be resolved.

The first of those counterclaims (count one) asserts that the Township's failure to conduct a soil inspection prior to purchasing the Property constitutes actionable negligence.  The second (court four) contends that the Township breached a prior settlement agreement between the parties by bringing this suit.  The other five, although styled as different causes of action, are all

premised on the Mandelbaums' contention that the Township had a duty under the New Jersey Eminent Domain Statute ("NJEDS"), N.J. Stat. Ann. §§ 20:3-1, et seq., and various common law doctrines to disclose an appraisal it carried out prior to purchasing the Property, but failed to do so.

In the pending Motion, the Township requests summary judgment on the first two counterclaims (counts one and four) and argues that the other five should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  With respect to counts one and four, the Township contends that it owed no legal duty to conduct a soil inspection before purchasing the Property, and the waiver of claims included in the prior settlement agreement applied only to potential condemnation proceedings and did not prohibit environmental claims.  It then argues that the remaining counts must be dismissed because the NJEDS does not create a private right of action that would allow the types of counterclaims asserted by the Mandelbaums.  Rather, the Township contends that the exclusive remedy for violations of that statute is dismissal of the condemnation complaint filed by a municipality seeking to acquire a given property.  Since no such complaint was filed in this case, the Township asserts that the Mandelbaums' counterclaims under the NJDES must be dismissed.

The Mandelbaums counter with broad-ranging statutory and constitutional arguments. With respect to counts one and four, they contend that (1) the recommendation of the environmental consultants hired by the Township that it conduct soil testing prior to purchasing the Property gave rise to a legal duty to do so, and (2) the waiver language contained in the settlement agreement was intended to apply to environmental claims, including those based on contamination that had not yet been discovered at the time the parties entered that agreement.  In support of their other counterclaims, the Mandelbaums argue that, although the NJEDS does not

explicitly create a private right of action to redress situations such as the Township's failure to disclose the appraisal in this case, such a right is implied by the language of that statute. In doing so, the Mandelbaums assert that the Township's failure to provide the appraisal report prior to purchasing the property was a due process violation and a refusal by the Court to imply a right of action to redress that failure would therefore infringe their constitutional rights. Additionally, they argue that such an implied right of action is consistent with the purpose of the NJEDS, which was enacted in order to curb abuses of the condemnation process.

      For the reasons set forth below, the Township's Motion will be granted and the Mandelbaums' remaining counterclaims will be dismissed with prejudice. Although it may have been advisable for the Township to conduct a soil inspection prior to purchasing the Property, it was under no legal obligation to do so. Nor did it owe any fiduciary or other duty to the Mandelbaums by virtue of its status as a municipality other than those imposed by the NJEDS. The fact that the waiver provision in that agreement applied only to claims which arose before closing forecloses the Mandelbaums' breach of contract claim. Finally, the counterclaims based on the Township's failure to disclose the results of the appraisal it carried out prior to purchasing the Property must be dismissed. Whether the NJEDS includes a private right of action – a point to which both parties have directed a significant portion of their arguments – is irrelevant, as there is no evidence that the Mandelbaums suffered any harm due to the Township's actions in failing to disclose the appraisal. To the contrary, the appraisal at issue contemplated a different type of development than the one eventually pursued by the parties, and is therefore of little to no relevance to the claims asserted by the Township in this suit after it discovered the environmental contamination on the Property.

## I. BACKGROUND

The facts underlying this dispute were set forth comprehensively in two of the Court's prior rulings:  (1) the October 7, 2009 Opinion in this matter and (2) the September 22, 2009 Opinion issued in a related case, Bonnieview Homeowners Association v. Woodmont Builders, LLC, 655 F. Supp.2d 473 (D.N.J. 2009).  For the sake of brevity, the Court will refrain from revisiting the majority of the facts outlined in those rulings.

As discussed above, this matter involves a dispute over responsibility for the cost of remediating soil contamination on the Property, which the Mandelbaum Defendants sold to the Township in 1999.  From 1941 until it was abandoned sometime prior to 1970, the Property was the site of a fruit orchard known as "Bonnieview Farms."  During the orchard's operation, the Property's soil was contaminated with several hazardous chemicals – including dichlorodiphenyltrichloroethane ("DDT"), arsenic, and lead – that were widely utilized as pesticides prior to the enactment of environmental regulations banning their use.  In 1970, the Mandelbaum Defendants purchased the Property.

**A.  Purchase and Appraisal**

In 1997, Woodmont expressed interest in building a residential subdivision on a portion of the Property.  The Mandelbaums entered into an agreement with the company whereby a section of the Property would be subdivided into 42 residential lots on which Woodmont would construct single-family homes.  The parties would then share the proceeds derived from the sale of those residences.

In order to facilitate Woodmont's subdivision plan, the Township began negotiations to acquire the Property in October 1997 and obtained an appraisal of the land on January 26, 1998.  See (Pl.'s Br. Supp. Mot. Dismiss Countercls., Ex. B.)  The appraisal split the Property into three

parts:  (1) Block/Lot 21.01/42, (2) Block/Lot 21.02/42, and (3) Block/Lot 21.02/42.01.  (Id. at

20, 22.)  Block/Lot 21.01/42, which comprised 118.32 acres and was to be subdivided into 42

individual lots on which residences would be constructed pursuant to Woodmont's subdivision

proposal, was valued at $4.62 million.  (Id. at 36.)  Despite the fact that Woodmont's subdivision

plan called only for the construction of 42 residences on Block/Lot 21.01/42, the appraiser hired

by the Township priced the other two parcels – Block Lot 21.02/42 and Block/Lot 21.02/42.01 –

based on their potential value as residential lots.  The first was priced at $500,000, reflecting a

potential for subdivision into four lots.  (Id. at 36-37.)  The second was fit for one lot, and was

priced at $175,000.  (Id. at 37.)  Thus, the appraiser hired by the Township set the total value of

the Property at approximately $5.3 million, based on the assumption that it would yield 47 lots

upon subdivision.  The Township did not inform the Mandelbaums that it had carried out the

appraisal or disclose its findings.

   The appraisal appears to have been carried out in order to obtain an estimate of the

compensation to be paid to the Mandelbaums in the event that the Township acquired the

Property through condemnation proceedings.  In a section titled "The Appraisal Problem," the

appraisal stated that "the proposed acquisition [of the Property] is contemplated as a 'total

taking.'"  (Id. at 11.)  Elsewhere, the appraisal declared that its "value estimate" of the Property's

worth was to be "regarded as 'Just Compensation' to be paid to the property owner in response

to a total taking of the subject [property] through condemnation."  (Id. at 12.)  However, the

appraisal noted that the Township had not yet decided whether to proceed by means of

condemnation, stating "[t]o date, no complaint has been filed."  (Id.)  In fact, the appraisal

specifically acknowledged that it was a preliminary assessment, stating that "[s]hould this matter

proceed to condemnation the property may have to be re-inspected in the company of the

property owner or its representative." (Id. at 15.)  That statement is an obvious reference to the appraisal provision contained in the NJEDS, which requires that "[p]rior to making a [compensation] offer [during condemnation proceedings] the taking agency shall appraise [the] property and the owner shall be given an opportunity to accompany the appraiser during inspection of the property."  N.J. Stat. Ann. § 20:3-6.

The parties' efforts to carry out the subdivision plan met with complications when Woodmont sought zoning approval from the Township's Planning Board ("the Board").  On February 26, 1998, the Board denied the application.  Alleging that the Board's decision was arbitrary and capricious because the subdivision plan complied with all applicable zoning restrictions, Woodmont subsequently filed a Complaint in the Superior Court of New Jersey seeking to compel approval.

Undeterred, the Township, Woodmont, and the Mandelbaums continued their negotiations following the Planning Board's decision rejecting the subdivision proposal and Woodmont's filing of the aforementioned Complaint seeking to compel approval for that initiative.  Those negotiations proved fruitful, culminating in a September 1998 settlement agreement between the parties.  Pursuant to the settlement, Woodmont agreed to dismiss its Complaint seeking approval for a 42-residence subdivision in favor of a smaller development that would include 25 houses.  The Township agreed, pending approval of the Board, to purchase the remainder of the Property.  The settlement agreement stated that the latter purchase was to be made "in lieu of condemnation." (Pl.'s Br. Supp. Mot. Dismiss Countercls., Ex. A at 2.)  It also included a waiver of legal claims, which stated that:

> Upon the event of closing and upon the conveyance by the [Mandelbaums] of the aforesaid non-development lands to the Township, and, further, upon receipt of $2,200,000.00 from the Township, the parties agree that, by operation of this Agreement, such events shall constitute a release of all parties to this Agreement

from any other claims at law or in equity which any party hereto may have had
against any other party hereto prior to the event of closing.  Within a reasonable
period of time after closing, Woodmont and the [Mandelbaums] shall dismiss the
above referenced lawsuit with prejudice.

(Id. at 7, ¶ 14.)

On September 24, 1998, the Planning Board approved Woodmont's revised subdivision

proposal and authorized the company to construct 25 residences on a 30-acre portion of the

Property.  At the same time, the Board approved the Township's plan to acquire the remaining

100 acres of the Property for use as open space ("the open space parcel").  On February 10,

1999, the Township entered an agreement with the Mandelbaums to purchase 99 acres of that

parcel for the sum of $2.2 million, the price specified by the settlement agreement.  In a later

transaction, the Township obtained another half acre for one dollar.[1]  The Township did not file

a condemnation complaint or any other formal action at any point during the negotiations to

acquire the Property.

**B.  Discovery of Soil Contamination**

At the time the Mandelbaums sold the Property to the Township, neither party was aware

of the soil contamination that led to this suit.  In fact, the Township arranged two environmental

assessments – one before purchase and one shortly thereafter – but because neither included soil

sampling, they both failed to reveal the presence of chemicals left over from the Property's use

as a fruit orchard.  The first was carried out in April 1998 by the environmental engineering firm

of Post, Buckley, Schuh & Jernigan, Inc. ("PBS&J").  In its report, PBS&J noted that the

Property contained surface debris, but concluded that "[a]lthough none of the observed debris

---

[1] The Mandelbaums contend that the Township purchased the Property on July 13, 1999.  See
(Defs.' Br. Opp'n Mot. Dismiss Counterclaims 16.)  The Court ruled in its September 22, 2009
decision in Bonnieview, 655 F. Supp.2d at 481 n.3, that the purchase actually occurred on
February 10 and May 25, 1999.  In light of that ruling, the purchase date cited by the
Mandelbaums will be disregarded.

was considered hazardous, additional material in lower layers could be classified as such."
PBS&J did not recommend that the Township conduct soil sampling at that time, but stated that
"when the debris is removed, the lower layers should be carefully examined."  Before closing on
the Property, the Township was told that the debris had been removed, but did not take steps to
investigate possible contamination in the lower soil levels.  After the purchase was complete,
however, the Township discovered that the debris had not been removed.

In 1999, after purchasing the Property, the Township engaged an environmental
consulting firm, Princeton Hydro, LLC ("Princeton"), to conduct a second inspection.  In its May
10, 1999 report, Princeton did not mention any discharge of pesticides during the use of the
Property as a fruit orchard, and did not recommend subterranean sampling or any other action
that might have revealed the soil contamination that led to this suit.

It was not until almost three years later that the Township discovered that the soil on the
Property contained environmental contaminants.  In late 1999, Township authorities were
informed that the surface debris noted in PBS&J's report – which the settlement agreement
between the parties stated would be removed prior to closing – was still on the Property.  The
Township dispatched an engineer employed by its Public Works Department to investigate.  In a
March 24, 2000 report, the engineer confirmed that the debris had not been removed, and
suggested that once that task was carried out the Township should conduct subsurface soil
sampling in the areas where the debris had previously been.  The Township followed the
engineer's recommendation; after removing the debris, it hired an environmental consulting firm,
Maser, P.A. ("Maser") to conduct subsurface soil sampling on the "open space" parcel.  Maser
completed its investigation in August 2002.  Its findings were definitive and devastating:  large

sections of the soil on the Property were contaminated with several harmful chemicals, including lead, arsenic, and DDT.

## C.  Cleanup and Ensuing Legal Action

Following the discovery of soil contamination on the open space parcel, the Township conducted a voluntary cleanup of the Property in cooperation with the New Jersey Department of Environmental Protection.  On June 5, 2003, after completing that cleanup, it filed this suit, in which it sought to recover some portion of its costs from PSB&J, Woodmont, the Mandelbaums, and several other individuals who were previously joint owners of the Property (collectively, "the Mandelbaum Defendants").  In its 14-count Complaint, the Township asserted claims pursuant to (1) §§ 107(a) and 113(f) of the CERCLA, (2) the New Jersey Spill Act, and (3) various common law causes of action.[2]

As discussed above, all of the Township's claims have been rejected.  The Court dismissed nine of the twelve counts asserted against the Mandelbaum Defendants and ten of the thirteen counts asserted against PBS&J in a ruling dated September 4, 2004.  See 2004 U.S. Dist. LEXIS 30606.  On September 27, 2005, PBS&J moved to dismiss the remaining claims asserted against it.  That motion was granted on January 6, 2006.  In the same ruling, the Court dismissed with prejudice the Township's claims against all individual Defendants except David and Nathan Mandelbaum.  The Township did not appeal that decision.  Thus, PBS&J and the individual Defendants other than David and Nathan Mandelbaum are no longer involved in these proceedings.  Following a petition to the Court of Appeals and remand of the action due to an intervening change in law, see 244 Fed. App'x 514 (3d Cir. 2007), Woodmont and the Mandelbaums moved for summary judgment on all remaining claims.  The Court granted those

_____

[2] Count I was brought under CERCLA § 107(a); Count II was brought under CERCLA § 113(f); Count III was for a declaratory judgment under CERCLA; and Count IV was brought under the New Jersey Spill Act.  The remaining counts were common law claims.

motions and dismissed the Township's outstanding claims against the Mandelbaums and

Woodmont on October 7, 2009.  See 2009 U.S. Dist. LEXIS 93629.  As part of that ruling, the

Court held that the Mandelbaums are not liable for the contamination of the Property or the costs

associated with remediating that contamination.  Therefore, counts two, three, and five of the

Mandelbaum's counterclaims – which sought common law contribution, contribution under the

CERLCA, and declaratory judgment that the Mandelbaums were not liable – are moot.  Only

seven of the Mandelbaums' original ten counterclaims against the Township have yet to be

resolved.

**C.  The Mandelbaums' Remaining Counterclaims**

The first of those counterclaims (count one) asserts that the Township's failure to conduct

a subsurface soil inspection prior to purchasing the Property constitutes actionable negligence.

Specifically, the Mandelbaums argue that the Township should have known prior to purchasing

the Property that its soil might be contaminated because Township officials were aware that the

land had been used as a fruit orchard prior to 1970 and the its environmental consultant, PBS&J,

had stated in its April 1998 report that "when the debris is removed, the lower layers should be

carefully examined."  In light of that knowledge, the Mandelbaums claim that the Township (1)

"had a duty to investigate subsurface conditions on the [P]roperty owing not only to citizens of

the Township, but also to prospective purchasers of the subdivided lots, as well as the

Mandelbaum Defendants," (Countercl. ¶ 30), and (2) breached that duty by failing to conduct

such an investigation prior to taking possession of the Property.  (Countercl. ¶ 29.)  Other than

the fact that "they [we]re compelled to expend dollars in defense of this litigation," however, the

Mandelbaums do not articulate any harm that they suffered as a result of the Township's alleged

negligence.  (Countercl. ¶ 31.)

In their second counterclaim (count four), the Mandelbaums contend that the Township breached the September 1998 settlement agreement by instituting this litigation.  That claim is premised on the aforementioned waiver provision contained in the settlement agreement, which stated that its execution would "constitute a release of all parties to this Agreement from any other claims at law or in equity which any party hereto may have had against any other party hereto prior to the event of closing."  (Pl.'s Br. Supp. Mot. Dismiss Countercls., Ex. A at 7, ¶ 14.)  As with their first counterclaim, the Mandelbaums contend that they suffered damages in the form of counsel fees and other costs related to this suit.  (Countercl. ¶ 42.)

The other five remaining counterclaims (counts six through ten) are premised on the Township's failure to disclose the January 1998 appraisal before purchasing the Property.  The first (count six) is styled as a claim under the NJEDS.  The Mandelbaums argue that the Township's failure to share the results of the appraisal violated that statute's requirement that a municipality acquiring property through condemnation engage in "bona fide negotiations with the prospective condemnee."  N.J. Stat. Ann. § 20:3-6.  Based on that alleged violation and their contention that they "were unduly prejudiced" by not having the chance to review the appraisal before selling the Property, the Mandelbaums seek attorneys' fees, litigation costs, and unspecified other damages.  (Countercl. ¶¶ 53, 57.)

The second (count seven) of the Mandelbaums' five counterclaims premised on the Township's failure to disclose the January 1998 appraisal is essentially the same as the first, but is purportedly based on common law rather than the NJEDS.  See (Countercl. ¶ 62) ("Under the common law, Plaintiff had a duty to disclose the appraisal.")  As with their NJEDS counterclaim, the Mandelbaums argue that they are entitled to attorneys' fees, litigation costs, and

indeterminate other damages based on the Township's alleged violation of common law in failing to disclose the appraisal.  (Countercl. ¶ 66.)

The Mandelbaums' third counterclaim based on the Township's failure to disclose the appraisal (count eight) is styled as a cause of action under 42 U.S.C. § 1983.  As part of that counterclaim, the Mandelbaums note that the Fifth and Fourteenth Amendments to the United States Constitution, along with the New Jersey Constitution, require a government entity taking private property for public use to provide fair compensation.  (Coutnercl. ¶¶ 70, 71.)  In a logical leap, they then contend in allegations largely duplicative of those contained in count six that the Township violated that requirement not by paying less for the Property than it was worth, but rather by failing to disclose the January 1998 appraisal.  See (Countercl. ¶¶ 74, 77) ("Under [the NJEDS], the Plaintiff had a duty to provide an appraisal as part of its 'bona fide' negotiation to acquire the Property … Plaintiff's violation of the clear dictates of [the NJEDS] constitute violations of due process and just compensation under the United States and New Jersey Constitutions.")  As with their other counterclaims, the Mandelbaums as redress for that purported constitutional violation seek attorneys' fees, litigation costs, and unspecified damages. (Countercl. ¶ 80.)

The Mandelbaums' next counterclaim (count nine) asserts a breach of contract cause of action.  Without citing any provision of that agreement that would impose such a duty, the Mandelbaums claim that "Plaintiff had a duty to disclose the [a]ppraisal" pursuant to the September 1998 settlement between the parties, and breached that duty by failing to do so. (Countercl. ¶¶ 83, 84.)  Again, they seek as compensation attorneys' fees, litigation costs, and unspecified damages.  (Countercl. ¶ 85.)

The Mandelbaums' final counterclaim (count ten) is also premised on their contention that the Township breached its duties under the September 1998 settlement agreement. However, unlike count nine – which invoked the agreement itself – count ten argues that the Township's failure to disclose the appraisal prior to purchasing the Property was a breach of the covenant of good faith and fair dealing inherent in that settlement.  (Countercl. ¶¶ 88, 89.)  As in count nine, the Mandelbaums seek attorneys' fees, litigation costs, and unspecified damages as redress for that alleged breach.  (Countercl. ¶ 90.)

## II.  DISCUSSION

As discussed above, the pending Motion includes two parts.  In the first, the Township moves for summary judgment on counts one and four of the Mandelbaums' counterclaims. Additionally, the Township contends that the counterclaims based on its failure to disclose the appraisal it carried out before purchasing the Property – counts six through ten – must be dismissed for failure to state a claim on which relief can be granted.  In light of the fact that the two parts of the Township's Motion implicate different standards of review, the Court will address them separately.

Before doing so, however, the Court notes that each of the Mandelbaums' seven remaining counterclaims seeks the same relief:  attorneys' fees, litigation costs, and unspecified "damages" incurred as a result of the Township's decision to institute this litigation.  The Mandelbaums do not contend that they suffered some harm independent of being forced to defend this suit.  Rather, they have invoked disparate legal theories and arguments ranging from novel constitutional assertions to mundane contract law in an apparent effort to (1) prove they should not have been sued, and (2) punish the Township for doing so.  The Mandelbaums' have already achieved the first of those goals; this Court's October 7, 2009 ruling absolved them of

any liability for the environmental contamination of the Property.  The second may have been pursued by means of a motion for attorneys' fees submitted within 30 days of that ruling as required by Federal Rule of Civil Procedure 54(d)(2).[3]  For the reasons set forth below, however, the Mandelbaums cannot recover their attorneys' fees and costs by dressing up what should have been a simple motion for those expenses as a series of creative, but ultimately meritless, counterclaims.

## A.  Motion for Summary Judgment – Counts One and Four

The Township argues that it is entitled to summary judgment on counts one and four of the Mandelbaums' remaining counterclaims.  With respect to the negligence counterclaim (count one), the Township contends that it owed no duty to the Mandelbaums to conduct sub-surface soil testing prior to purchasing the Property.  The Mandelbaums counter by arguing that the Township had such a duty because it should have known about the contamination.  In doing so, they note PBS&J's recommendation in its April 1998 report that "when the debris is removed, the lower layers should be carefully examined."  They then claim that "there can be no dispute that [the Township] had a duty to investigated once [PBS&J] … advised it to do so."  (Defs.' Br. Opp'n Mot. Dismiss Countercls. 50.)

Regarding the Mandelbaums' contention that it breached the September 1998 settlement agreement by bringing this suit (count four), the Township argues that the waiver provision in that agreement applied only to Woodmont's suit seeking to compel approval for its subdivision application and other claims which arose prior to closing, and did not include post-closing environmental claims such as the ones at issue in this litigation.  In doing so, the Township

---

[3] Federal Rule of Civil Procedure 54(d)(2)(B) requires that motions for attorneys' fees and costs be filed "no more than 14 days after the entry of judgment" unless "a statute or court order provides otherwise."  This district has a standing order, in the form of Local Civil Rule 54.2, that extends the deadline for the filing of such petitions from 14 to 30 days.  See United Auto Workers Local 259 v. Metro Auto Ctr., 501 F.3d 283, 286 (3d Cir. 2007).

points out the fact that other portions of that agreement specifically referenced the Woodmont's suit and any prospective condemnation proceeding, but did not mention environmental claims. (Pl.'s Br. Supp. Mot. Dismiss Countercls. 47-48.)  Additionally, the Township notes that the settlement agreement does not provide for the recovery of attorneys' fees or litigation costs in the event of a breach, and on that basis argues that even if Court accepted their contention that the Township breached the September 1998 settlement agreement, the Mandelbaums would not be entitled to the relief they seek in that counterclaim.  (Id. at 51.)

In opposition to the Township's request for summary judgment on count four of their counterclaims, the Mandelbaums note that nothing in the text of the September 1998 settlement agreement's waiver provision restricted the applicability of that provision to Woodmont's suit seeking to compel approval for the subdivision application or any potential condemnation action. Rather, they argue that the waiver provision was a "general release," and applied to all claims that would have been revealed by an accurate survey of the Property – including the environmental claims in this suit, which could only have been discovered by means of soil sampling.  (Defs.' Br. Opp'n Mot. Dismiss Countercls. 57-58.)

As discussed above, the portion of the pending Motion relating to counts one and four of the Mandelbaums' counterclaims is styled as a request for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56(c).  Therefore, the Court must apply the standard of review applicable to such Motions when assessing the parties' respective arguments.

### i.    *Standard of Review*

Summary judgment is proper where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

ii.     *Count One – Negligence*

Under that standard, the Mandlebaums' negligence counterclaim (count one) must fail. The Mandelbaums have not cited, and the Court is not aware of, any case holding that the purchaser of land has a duty to the seller if that purchaser happens to be a municipality.  Nor have they produced any legal precedent for the proposition that an individual or entity purchasing real property must inspect that property beforehand.  To the contrary, it has long been established under New Jersey law relating to the sale of property that "the purchaser owe[s] no duty to the seller."  Young v. Hughes, 32 N.J. Eq. 372, 1880 WL 7460 at *10 (N.J. 1880).  A buyer's failure to properly inspect a property may be used by the seller to assert a comparative negligence defense in an ensuing lawsuit, but it does not create an independent cause of action.  See Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 603 A.2d 557, 560 (N.J. Super. Ct. App. Div. 1992) (discussing comparative negligence in the context of land purchases).  The reason for that fact is simple:  a seller of land suffers no harm from the buyer's negligence in failing to diligently inspect that property.  Once the purchase is complete and the buyer takes possession of the land, any latent conditions on that property are his to contend with – put simply, they are no longer the seller's problem.[4]

The circumstances of this suit are illustrative of that principle.  The "harm" complained of by the Mandelbaums is not that the Township purchased the Property without first learning that its soil was contaminated, but rather that it sought to hold them liable for the costs of remediating that contamination by instituting this suit.  In other words, the Mandelbaums' negligence counterclaim conflates two separate actions:  (1) the Township's failure to conduct

---

[4] This analysis applies only to latent defects in the property that were unknown to the seller.  It is well-established that a seller of real estate must disclose "defects known to him and unknown and unobservable by the buyer," and that failure to do so may justify equitable recission of the purchase agreement.  Weintraub v. Krobatsch, 317 A.2d 68, 74 (N.J. 1974).

soil sampling, and (2) its later decision to bring a suit seeking redress for the costs of remediating the contamination on the Property.  The damages the Mandelbaums seek – attorneys' fees and litigation costs – are not attributable to the second, and have nothing to do with the first.[5]  If it had taken possession of the Property, discovered it was contaminated, and opted not to bring an action against the Mandelbaums, the Township's alleged negligence in failing to conduct soil sampling would be totally immaterial.  It is only the fact that it did bring such a suit – which the Court ruled in its October 7, 2009 Opinion was without merit – that led the Mandelbaums to claim that they were harmed by the Township's failure to inspect the Property's soil.  Therefore, the Court will grant the Township's Motion for Summary Judgment and dismiss count one of the Mandelbaums' counterclaims.

### iii. Count Four – Breach of the September 1998 Settlement Agreement

The Mandelbaums' contention that the Township breached the September 1998 settlement agreement by instituting this suit (count four) is similarly unavailing.  The waiver provision contained in that agreement applied only to "claims at law or in equity which any party … may have had … prior to the event of closing."  (Pl.'s Br. Supp. Mot. Dismiss Countercls., Ex. A at 7, ¶ 14.)  None of the claims asserted by the Township against the Mandelbaums in this litigation were justiciable prior to closing.  Therefore, the Township is entitled to summary judgment ruling that it did not breach the 1998 settlement agreement and dismissing count four of the Mandelbaums' counterclaims.

As mentioned above, the Township's June 5, 2003 Complaint asserted 12 claims against the Mandelbaums, three of which were premised on CERLCA.  The first of those claims alleged that the Mandelbaums were liable under CERCLA § 107(a)(2), as former owners or operators of

---

[5] As discussed above, the proper method for seeking reimbursement of attorneys' fees and litigation costs incurred as the result of being forced to defend against a meritless lawsuit is a motion under Federal Rule of Civil Procedure 54(d)(2).

the Property, for the costs incurred by the Township in remediating the contamination on the Property. The second sought contribution under CERCLA § 113(f), which allows a Court to equitably apportion liability for the remediation of environmental contamination. The third was largely duplicative of the first two, and sought declaratory judgment that the Mandelbaums were liable under CERCLA.

None of the Township's CERCLA claims arose prior to closing. The expenses sought under both §§ 107(a)(2) and 113(f) were incurred in connection with the cleanup undertaken by the Township and the NJDEP between August 2002 and June 2003 – a full three years after the Township closed on and took possession of the Property. Under the terms of both § 107(a), which limits recovery to costs actually incurred in such a cleanup, and § 113(f), which states that a plaintiff may recover only from someone who is potentially liable under the former section, the Township could not have brought suit seeking those expenses until after the conclusion of its remediation efforts. Thus, the Township did not have any potential CERCLA claims until after it had closed on the Property and remediated the soil contamination, and the waiver provision contained in the September 1998 settlement agreement did not apply to those claims.

The Township's other claims – which were premised on the New Jersey Spill Act and various common law doctrines – are similar. In each of those claims, the Township sought reimbursement for expenses it did not incur until after closing on the Property, namely the remediation of the soil contamination. Even if the Township had known of the contamination before closing, any suit seeking those expenses would have been unripe and speculative until the point at which their amount could be ascertained with certainty – the conclusion of the cleanup. Therefore, the Court rules that the Township's claims in this litigation did not arise prior to

closing and were not subject to the September 1998 settlement agreement, and will grant

summary judgment on count four of the Mandelbaums' counterclaims.

**B.  Motion to Dismiss – Counts Six through Ten**

In the second part of the pending Motion, the Township argues that the other five

remaining counterclaims – all of which are based on its failure to disclose the January 26, 1998

appraisal prior to purchasing the Property – must be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  Noting that each of those counterclaims invokes the NJEDS, the Township

argues that they must be rejected because that statute does not create a private remedy beyond

dismissal of a condemning authority's condemnation complaint, and no such complaint was filed

in this case.  The Mandelbaums counter that a private right of action and remedy is implied by

the language of the NJEDS.  Despite the fact that no New Jersey court has ever recognized such

a remedy, they contend that this Court must do so in order to avoid infringing on their

constitutional due process rights.

In light of the fact that the Township's request that the Court dismiss counts six through

ten of the Mandelbaums' counterclaims is premised on Federal Rule of Civil Procedure 12(b)(6),

the Court must apply the standard of review applicable to such motions when assessing the

parties' arguments.  For the reasons set forth below, the novel questions of New Jersey law posed

by those arguments – which ask this Court to determine whether the NJEDS confers a private

right of action and remedy that has never been recognized by the New Jersey courts – need not

be addressed.  To the contrary, the factual differences between the subdivision plan contemplated

by the January 26, 1998 appraisal and the one eventually settled on by the parties, along with the

fact that the Mandelbaums have not alleged that the compensation they received was less than

the amount to which they were entitled under the NJEDS, compel the conclusion that the

Mandelbaums suffered no harm from being denied the opportunity to review that appraisal prior to the sale of the Property.

### i.      Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  When considering a Rule 12(b)(6) motion, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases:  Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007).  The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  In contrast, Twombly, 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged."  Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery

will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

### ii.     Counts Six through Ten – Failure to Disclose the January 26, 1998 Appraisal

Under that standard, the Mandelbaums' counterclaims based on the Township's failure to disclose the January 26, 1998 appraisal (counts six through ten) must be dismissed. As discussed above, that appraisal based its estimate of the Property's value on the assumption that Woodmont's original subdivision plan, which called for the construction of 42 residences, would be approved. See (Pl.'s Br. Supp. Mot. Dismiss Countercls., Ex. B at 36.) In fact, the appraiser assumed that an additional five lots would be derived from the Property, bringing the total number of potential residences to 47. (Id.) In doing so, the appraisal split the Property into three parcels: (1) Block/Lot 21.01/42, which comprised 118.32 acres and was to be the site of the 42 residences called for in Woodmont's plan, (2) Block/Lot 21.02/42, which comprised 13.08 acres and would include four more lots, and (3) Block/Lot 21.02/42.01, which included 2.05 acres to be used as one lot for the construction of either a residence or business. (Id. at 20, 22.)

Importantly, the appraisal did not include an "open space" parcel or calculate the affect of including such a parcel on the total value of the Property.

The final subdivision plan set forth by the parties in the September 1998 settlement agreement and eventually approved by the Township's Planning Board is markedly different from the one contemplated by the appraisal. Under that plan, only 30 acres of the Property were set aside for development, while the remaining 100 were reserved as "open space." Moreover, the 30 acres on which development was allowed were divided into 25 lots, not the 42 called for by the original plan. See Bonnieview, 655 F. Supp.2d at 481-81 (discussing the development plan eventually pursued by the parties).

In light of the material differences between the original subdivision plan contemplated by the January 26, 1998 appraisal and the one eventually agreed to by the parties, the Mandelbaums suffered no harm from the Township's failure to disclose that appraisal. Put simply, the product the Mandelbaums' sold under the September 1998 settlement agreement was a different one than was appraised in January of that year. The appraisal would have been of no use in determining the fair market value of the Property under the later subdivision plan. Thus, the Mandelbaums suffered no prejudice as a result of not having access to that appraisal.[6]

Moreover, there is no connection between the harm complained of by the Mandelbaums in their counterclaims and the Township's failure to disclose the appraisal. The Mandelbaums do not contend that the price paid by the Township for the Property did not constitute fair compensation. Nor do they argue that the appraisal was relevant to the calculation of that compensation – as discussed above, any such argument would be absurd in light of the material

---

[6] In light of the differences between the development plan contemplated by the appraisal and the one eventually agreed to by the parties, the Court need not decide whether (as argued by the Mandelbaums) the Township's purchase of the Property "in lieu of condemnation" triggered the protections of the NJEDS, or whether (as asserted by the Township) those protections do not arise until after the filing of a condemnation complaint.

differences between the development contemplated by the appraisal and the one eventually

pursued.  Rather, the Mandelbaums assert in a conclusory fashion that they were "prejudiced" by

the Township's failure to disclose the appraisal, but other than attorneys' fees and litigation

costs, point to no specific harm suffered as the result of that failure.  See (Countercl. ¶¶ 57, 66,

80, 85, 90.)  As discussed above, those purported damages are attributable to the Township's

decision to bring this action, not the events that took place before that decision.  If the Township

had chosen not to sue after discovering the Property was contaminated, the Mandelbaums would

have suffered none of the harms of which they complain, regardless of whether the appraisal had

been disclosed or not.  Therefore, the Mandelbaums' counterclaims based on the Township's

failure to disclose the appraisal will be dismissed with prejudice.

### III.  CONCLUSION

For the reasons set forth above, the Township's Motion is granted and the Mandelbaums'

remaining counterclaims are dismissed in their entirety with prejudice.


 **s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  June 7, 2010